OPINION
{¶ 1} This accelerated calendar appeal stems from a judgment rendered by the Trumbull County Court of Common Pleas, granting summary judgment in favor of appellees, Sam Brown ("Mr. Brown") and Bob Toth ("Mr. Toth"), d.b.a. Automotive Events, ("Automotive Events") on appellant's, William H. Moyer, claim for unpaid compensation based on a written incentive agreement in effect at the time of his employment.
{¶ 2} By way of background, on May 12, 1998, appellees offered and appellant subsequently accepted the position of account executive with Automotive Events, a public relations business involved in promoting new product lines for various corporations. According to Mr. Toth, the president of Automotive Events, appellant's duties included sales and account services, contacting prospective clients, preparing sales presentations, assisting in preparing proposals, and interfacing with clients.
{¶ 3} As consideration for his employment, appellant was to receive an annual base salary of $50,000 and "a commission of 5% (per cent) of the gross profit on sales volume attributable to [him] during the tenure of [his] employment." The agreement further provided:
 {¶ 4} "Commission will be paid upon Automotive Events' receipt of client deposits. Our normal billing terms may vary, but typically are 1/3 upon receipt of the contract, 1/3 prior to the first program day and 1/3 at the completion of the project. * * *"
{¶ 5} During his employment, appellant contacted Douglas Oehler, the contracts/purchasing manager at Lexus, a division of Toyota Motors Sales, U.S.A., Inc., as a prospective client. Prior to this, Automotive Events never conducted any business with Lexus.
{¶ 6} According to Mr. Toth, three sales presentations were made to Lexus. Appellant, Mr. Brown, and Mr. Toth participated in the first presentation; then, appellant and Mr. John Thorn, ("Mr. Thorn") the account manager, conducted the second meeting.
{¶ 7} In between the first and second presentation, Lexus requested a financial proposal, and appellant was responsible for one segment of this proposal. Upon completion, the proposal was submitted to Lexus in conjunction with the second presentation. Thereafter, appellant was notified by Lexus through a July 26, 1999 correspondence that Automotive Events was chosen to coordinate Lexus' press event program:
 {¶ 8} "Congratulations! Automotive Events has been selected to operate the IS, LS and S.C. Long Lead Press Event Programs. Official authorization to proceed will be in the form of a fully signed Toyota purchase order containing all applicable costs and terms conditions.
 {¶ 9} "Automotive Events is also advised that components of the submitted proposal may be eliminated, modified or negotiated to provide the best value to Lexus for this project.
 {¶ 10} "Thank you for your efforts and professionalism to this point. The Lexus team is looking forward to working closely with you and your staff on three (3) very successful Long Lead Press Events. You will be contacted shortly to discuss the next steps."
{¶ 11} Mr. Toth explained that at this point, various details had to be worked out, such as conducting site visits, agreement on prices, approval of locations, and receipt of a purchase order. Thus, upon receiving the July 26, 1999 correspondence, appellant traveled to Memphis, Tennessee to conduct a site inspection and determine the feasibility of the site location. Ultimately, Lexus rejected Memphis as the site location. As a result, another site had to be selected, and Mr. Thorn and Mr. Brown made a third presentation to Lexus. This final presentation occurred sometime after appellant had resigned from Automotive Events in November 1999.[1]
{¶ 12} Subsequently, in March 2000, Automotive Events received and accepted the purchase order from Lexus, and the press event was eventually held. Appellant, however, did not receive a commission on the Lexus sale.
{¶ 13} As a result, on May 19, 2000, appellant filed a complaint against appellees contending he was entitled to a 5 percent commission of the gross profit on the Lexus sale. According to the complaint, during his tenure with Automotive Events "[appellant] was responsible for securing an agreement with Lexus Automobile Corporation for [appellees] to produce a `Long Leads Press Program'[.]"[2]
{¶ 14} On September 28, 2001, appellees filed a motion for summary judgment, arguing that since the Lexus purchase order was not received and accepted until after appellant had resigned his employment with Automotive Events, the sale did not occur during appellant's tenure of employment; thus, appellant was not entitled to a commission on the Lexus sale.[3] To support its position, appellees attached a copy of the written incentive agreement and filed appellant's deposition testimony with the trial court.
{¶ 15} On October 18, 2001, appellant filed a memorandum in opposition to appellees' motion for summary judgment, maintaining that he had successfully solicited Lexus to have Automotive Events operate its IS, LC, and S.C. Long Leads Press Program. According to appellant, confirmation of the Lexus sale occurred during his tenure of employment through the July 26, 1999 correspondence. Thus, appellant believed that he was entitled to commission resulting from the Lexus sale even though the gross profit was not received during his employment duration. In support of his position, appellant attached his own affidavit, a copy of the July 26, 1999 correspondence, and the deposition testimony of Mr. Toth.
{¶ 16} Upon consideration, the trial court granted appellees' motion for summary judgment without explanation. It is from this judgment appellant appeals, advancing a single assignment of error and reiterating the arguments set forth in his memorandum in opposition to summary judgment.
{¶ 17} An appellate court reviews a trial court's decision on a motion for summary judgment de novo. Grafton v. Ohio Edison Co.,77 Ohio St.3d 102, 105, 1996-Ohio-336. Pursuant to Civ.R. 56, summary judgment is appropriate when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can reach only one conclusion, which is adverse to the party against whom the motion is made, such party being entitled to have the evidence construed most strongly in his favor. Civ.R. 56(C); Mootispaw v. Eckstein, 76 Ohio St.3d 383, 385,1996-Ohio-389; Leibreich v. A.J. Refrigeration, Inc., 67 Ohio St.3d 266,268, 1993-Ohio-12; Bostic v. Connor (1988), 37 Ohio St.3d 144, 146.
{¶ 18} Material facts are those facts that might affect the outcome of the suit under the governing law of the case. Turner v.Turner, 67 Ohio St.3d 337, 340, 1993-Ohio-176, citing Anderson v. LibertyLobby, Inc. (1986), 477 U.S. 242, 248. To determine what constitutes a genuine issue, the court must decide whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided that one party must prevail as a matter of law. Turner at 340
{¶ 19} A party seeking summary judgment on the grounds that the nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim. Dresher v. Burt, 75 Ohio St.3d 280, 1996-Ohio-107. Accordingly, the moving party must specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claim. Id. If the moving party satisfies its initial burden under Civ.R. 56(C), the nonmoving party has the burden to respond, by affidavit or as otherwise provided in the rule, so as to demonstrate that there is a genuine issue of fact. Id. However, if the nonmoving party fails to do so, then the trial court may enter summary judgment against that party. Id.
{¶ 20} The rules pertaining to the construction of written contracts are well established. "A court's primary objective in interpreting a written contract is to ascertain the intent of the parties as expressed in the terms of the agreement. * * * Thus, a contract should be construed in a manner to give effect to the intentions of the parties." (Citations omitted.) Lake Cty. Bd. of Commrs. v. Consumers OhioWater Co. (Dec. 22, 2000), 11th Dist. No. 99-L-092, 2000 WL 1876631, at 3. In other words, "[t]he purpose of contract construction is to discover and effectuate the intent of the parties, and the intent of the parties is presumed to reside in the language they chose to use in the agreement." In re Murray, 11th Dist. No. 2000-T-0152, 2002-Ohio-1686, at ¶ 11.
{¶ 21} If the terms of a contract are clear and unambiguous, "then its interpretation is a matter of law, and there is no issue of fact to be determined." Lake Cty. Bd. of Commrs. at 3. If, however, the contract's terms are ambiguous such that "a provision cannot be determined from the four corners of the agreement, a factual determination of intent may be necessary to ascertain the provision's meaning." Id. "Contractual terms are ambiguous if the meaning of the terms cannot be deciphered from reading the entire contract or if the terms are reasonably susceptible to more than one interpretation."Murray at ¶ 12. Under these circumstances, extrinsic evidence will be considered in an attempt to give effect to the parties intentions. Id. at ¶ 11.
{¶ 22} Furthermore, "[w]hen interpreting ambiguous contracts, courts must make a legitimate attempt, after hearing the relevant parol evidence, to determine the intent of the contracting parties. Skivolockiv. E. Ohio Gas Co. (1974), 38 Ohio St.2d 244, 67 O.O.2d 321,313 N.E.2d 374, paragraph one of the syllabus. `Where application of this rule makes the meaning of the language clear, the secondary rule of construction of strict construction [sic] against the drafter is not applicable.' Malcuit v. Equity Oil Gas Funds, Inc., (1992),81 Ohio App.3d 236, 240, 610 N.E.2d 1044, 1046." (Footnote omitted.)Cline v. Rose (1994), 96 Ohio App.3d 611, 615.
{¶ 23} With these legal principals in mind, we turn to the instant matter. The crux of this appeal centers on the following provision contained in the written incentive agreement:
 {¶ 24} "[Appellant is entitled to] a commission of 5% (per cent) of the gross profit on sales volume attributable to [him] during the tenure of [his] employment." (Emphasis added.)
{¶ 25} At the outset, we must determine whether the above contractual provision is ambiguous.
{¶ 26} On appeal, appellant essentially argues that he successfully solicited Lexus as a client for Automotive Events, and that confirmation of the sale occurred during his tenure of employment through the July 26, 1999 correspondence from Lexus. From this, appellant concludes that he is entitled to a commission on the Lexus sale even though he was no longer an employee of Automotive Events at the time payment was received from Lexus as the sale was attributable to him.
{¶ 27} Appellees counter by maintaining that since the Lexus sale did not take place during his tenure of employment, appellant is not entitled to a commission. According to appellees, the sale did not occur until after appellant resigned and the actual purchase order from Lexus was received and accepted by Automotive Events. Prior to receiving the purchase order, appellees suggest that Lexus still had the right to reject the proposal pursuant to their July 26, 1999 letter.
{¶ 28} Upon consideration, we conclude that the phrase "sales volume attributable to [appellant] during the tenure of [his] employment" as used in the written incentive agreement is ambiguous in that this phrase cannot be deciphered from the plain reading of the contract. Further, the phrase is reasonably susceptible to more than one interpretation.
{¶ 29} We acknowledge that appellees maintain that the sale took place after appellant resigned when the purchase order from Lexus was received and accepted by Automotive Events. In contrast, appellant believes that the sale occurred prior to the receipt of the purchase order from Lexus and during the tenure of his employment.
{¶ 30} However, we believe that the key term in the above quoted phrase is "attributable." This term, as used in the written incentive agreement, is ambiguous as its meaning cannot be determined from the contract itself and is reasonably susceptible to a number of interpretations.
{¶ 31} For instance, in his deposition testimony, appellant explained that he believed the Lexus sale was directly attributable to him, and that this occurred during his tenure with Automotive Events:
 {¶ 32} "Q. Why would you feel that you were due a commission on the Lexus program?
 {¶ 33} "A. Because I feel that I had played a major part in developing that business.
 {¶ 34} "Q. Well, is that what entitles you to a commission in your mind?
 {¶ 35} "A. Absolutely. I was the one that brought that business in, we were eventually awarded the program after a proposal that John [Thorn] and I put together and delivered. And, yes, I do believe so.
{¶ 36} "* * *
 {¶ 37} "Q. * * * So, are you saying that the contract with Lexus became binding during the term of your employment?
 {¶ 38} "A. I'm saying that the Lexus program — as it says in here, gross profit on sales volume attributable to me during the tenure of my employment. I'm saying that the Lexus program sale, that sale of that program was directly attributable to me.
 {¶ 39} "Q. But it didn't happen during the tenure of your employment, did it?
{¶ 40} "A. Absolutely." (Emphasis added.)
{¶ 41} In contrast, Mr. Toth maintained that the sale was not attributable to appellant because he did not participate in the final presentation to Lexus:
 {¶ 42} "Q. Okay. Where did that third presentation take place?
 {¶ 43} "A. Took place in California, at one of the sites that was visited.
{¶ 44} "* * *
 {¶ 45} "Q. Okay. And who made that presentation on behalf of your company?
{¶ 46} "A. Sam Brown and John Thorn.
 {¶ 47} "Q. Okay. At that time was [appellant] still with your company?
{¶ 48} "A. I can't recall. I don't believe.
 {¶ 49} "Q. Okay. Is that the — is that the kind of meeting that if he was with your company you would expect him to be there, or would he have moved on to try to make other new sales?
{¶ 50} "A. He would have been expected to be there.
{¶ 51} "* * *
 {¶ 52} "Q. Okay. While we are on this contract, would it be fair to say that the Lexus program, all three of them, was a sale that was attributable to [appellant]?
{¶ 53} "A. No.
{¶ 54} "Q. To whom was this sale attributable?
{¶ 55} "A. To the company as a group. * * *
{¶ 56} "* * *
 {¶ 57} "Q. And [appellant] was the contract executive that made that sale that resulted, months later, in you getting the signed purchase order and the check, correct?
{¶ 58} "A. Not correct.
{¶ 59} "Q. Who was the contract executive?
 {¶ 60} "A. He [appellant] was partially instrumental while he was employed with us, but once he left the company, then the responsibilities for making that happen shifted to John Thorn and Sam Brown.
{¶ 61} "Q. Now —
 {¶ 62} "A. And so they closed the final presentation and the final sale, [appellant] did not." (Emphasis added.)
{¶ 63} In light of the conflicting parol evidence as to this ambiguous term, we believe it would be perfectly possible for a fact finder to determine that the phrase sales volume attributable to appellant during his tenure of employment is not synomous with executed sales contract. Moreover, while clearly the entire sales volume for the Lexus contract would not be attributable to appellant's sole efforts, again, a fact finder might easily determine that a quantifiable percentage of that particular sales volume was attributable to appellant's effort. Again, the fact finder, if it is a jury, would be instructed that this particular language should, in fact, be construed against the drafter of the document, appellees in this instance. As a result, we believe that there is a material issue of fact that has been presented in this motion for summary judgment, and that summary judgment was, therefore, inappropriate.
{¶ 64} In summation, material issues of fact exist as to the manner in which the phrase "sales volume attributable to [appellant] during the tenure of [his] employment" may be interpreted. As such, the trial court erred in granting appellees' motion for summary judgment.
{¶ 65} Based on the foregoing analysis, appellant's lone assignment of error is well-taken. Accordingly, the judgment of the trial court is reversed, and the matter is remanded for proceedings consistent with this opinion.
WILLIAM M. O'NEILL, P.J., ROBERT A. NADER, J., concur.
[1] On October 28, 1999, appellant submitted a letter of resignation to Mr. Brown and Mr. Toth and provided two weeks notice of departure.
[2] Appellant also alleged in his complaint that he was entitled to a $10,000 bonus for reaching and/or exceeding $1,000,000 in gross billing of sales for contracts received prior to December 31, 1999; that he was entitled to a $3,500 commission for a sale to the Honda Corporation; and that appellees acted maliciously and in bad faith in their refusal to pay him the monies that were legitimately due to him, thereby entitling appellant to punitive damages. These claims, however, are not at issue in the instant appeal.
[3] In their motion for summary judgment, appellees also presented arguments as to appellant's remaining claims for entitlement to a $10,000 sales bonus, commission on the Honda contract, and request for punitive damages. Appellant, however, did not respond to these arguments in his memorandum in opposition to summary judgment. As indicated earlier in this opinion, the disposition of these claims are not an issue on appeal.